### SNOW et al. v. UNITED STATES.

Circuit Court of Appeals, Fourth Circuit.
October 16, 1928.

No. 2721.

J. O. Carr and Kenneth O. Burgwin, both of Wilmington, N. C., for plaintiffs in error.

Irvin B. Tucker, U. S. Atty., of Whiteville, N. C.

Before WADDILL, PARKER, and NORTHCOTT, Circuit Judges.

WADDILL, Circuit Judge. R. E. Snow, A. R. Perry, and Walter Stanland, plaintiffs in error, were jointly indicted and tried with six persons also named in the indictment, and others to the grand jurors unknown, for conspiring to fraudulently import, and for importing, merchandise into the United States without paying import duties thereon, and for conspiring to remove and conceal, and for removing and concealing, distilled spirits upon which revenue taxes had not been paid, in violation of the statutes of the United States, and with committing various overt acts in furtherance of said conspiracy. The trial resulted in a verdict of guilty as to the defendants, with the exception of Ralph Jones, who was acquitted. The plaintiffs in error, Snow, Perry, and Stanland, appealed from the judgment of the District Court sentencing Snow and Perry to 18 months' imprisonment, and Stanland to one year and a day. The other defendants found guilty took no appeal from the action of the trial court on the verdicts against them. From the action of the court affecting them, the plaintiffs in error sued out the writs of error herein.

The assignments of error are 10 in number. The first, second, and third assignments are to the action of the court upon questions arising on the testimony; the fourth, to the failure of the court to instruct a verdict in favor of the defendants; the sixth, seventh, eighth, and ninth, for alleged errors in the court's charge to the jury; the fifth and tenth assignments are to the court's refusal to instruct a verdict in favor of the defendants at the conclusion of the government's case, as well as at the conclusion of all the testimony, and because of the alleged insufficiency of the ev-

idence upon the whole case to sustain the verdict of the jury. As the court's action depends so largely upon the findings of the jury and on questions of fact, a brief summary of the testimony, especially affecting the plaintiffs in error, will be given.

At the trial the government relied chiefly upon the testimony of Harrelson, a United States deputy marshal, who testified to the effect that, after receiving a report from certain parties residing in the section of Brunswick county, North Carolina, known generally as Calabash, that imported liquors were being transported from that section by means of trucks, he got in touch with other prohibition officers, and they went to the vicinity known as Calabash and stationed themselves on a road leading to the point where the informers said they had seen liquor being loaded the Saturday night before, and that they found concealed in the woods a Hupmobile and a Ford truck, with no license plates thereon; that after dark on Tuesday night, March 23, 1927, a Ford touring car came by, driven by defendant Stanland, and behind that came a Cadillac car, a Buick car, and a Chevrolet truck, all going in the same direction, and that the Ford car stopped in an isolated section of the road leading to Stanland's house, the other cars going on, after pushing the Ford out of the road; that later on the Cadillac car came out again, and the officers stopped it, but it had no liquor in it; that the officers then followed the road which showed signs of heavy traffic and was deeply rutted; that the road was a private one and led by Stanland's house; that beyond Stanland's house were two gates, one open and the other closed, with a warning posted to keep out; that the officers went through a gate about 3 o'clock in the morning and found the Chevrolet truck, the Buick car, and a Hupmobile car parked near a little house; that the officers went into this house and found four men in it asleep, but with no facilities for permanent camping or subsistence, and also found a quart bottle with some whisky in it in the house, and some magnesium flares. The witness further testified that about 90 feet from this house a pit was found by the officers containing 183 packages of distilled liquor; that each car mentioned by the witness had an extra five-gallon can of gasoline in it; that the pit was walled up on all sides and overhead, and a trap-door or open space about three or four feet square was in one corner; that the pit was a quarter of a mile from Stanland's house; that no one else lived in that part of the neck of land and that Stanland's hogs were running in the inclosure in which the house and pit were. The four men found in the shack were arrested, tried, and convicted, and did not appeal.

The government witness, Harrelson, further testified that during the day, after the finding of the pit and liquor, three men came up from the direction of the water landing, two of them being the defendants Perry and Snow; that they said that they had heard that a raid had taken place, and had come to get their cars left near by. The three said they had been aboard a boat out in the river, and had driven from Charleston, South Carolina, to bring repairs to the boat, which had broken down; that they gave their names as Perry, Snow, and Jones, and, upon being arrested, $1,000 in cash was found on Perry.

At the preliminary hearing it appeared that Snow's real name was Moss, Perry's was Perrycola, and Jones' real name was Wiggins. Stanland was arrested several weeks later, on information given by some of the government witnesses that he had actually assisted in the loading of the whisky several days previous to the raid.

The witness Harrelson also testified that, before the raid, he had talked with Clew Thomas, Liston Thomas, and one Wilson, from the Calabash section, who had told him that a boat was at Calabash near a place called Little River, with a load of whisky; that they said several days before that they had seen the defendant Stanland standing by and directing the loading. To this testimony, as to what the said Clew Thomas, Liston Thomas, and Wilson told witness, the defendants objected, which objection was overruled, the court being of the opinion that the same was admissible for corroborative purposes, and defendants excepted.

The defendants Snow and Perry, at their hearing before the commissioner, explained that they gave the fictitious names when arrested to prevent their identity being known down at their home in Charleston, S. C., by possible advertisement of the proceedings before the commissioner. The defendant Stanland denied the government's testimony that he had on a previous occasion authorized or directed the loading of the trucks with liquor, but admitted that he did say, as claimed by the government's witness appearing upon the scene, "This looks pretty bad for me." He said he did not mean by this statement to imply or admit guilt in the premises, but that the cir-

cumstances of the transportation being made in such close proximity to him would bring blame upon him as an official.

A mere casual reflection upon the uncontroverted facts makes clear the existence of the conspiracy charged to fraudulently import spirituous liquors into the United States in violation of the law, and the actual importation of the same as charged. The location of the scene of importation, the manner and circumstances surrounding the same, considered generally in regard to the location of the waters traversed, relative to the sea and the interior waters of the river, leading to the almost uninhabitable and lonely spot to which the liquor was transported and hidden for subsequent removal inland, the number of automobiles and other vehicles used, together with the large number of persons engaged in the undertaking, all acting in apparent concert, each in the aid of the others, almost conclusively establishes the existence of a fraudulent conspiracy as charged, and leaves for solution only the guilt or innocence of the particular defendants. The plaintiffs in error in this case, viz. R. E. Snow, A. R. Perry and Walter Stanland, are the only ones contesting the action of the trial court, and the assignments of error will be considered as applicable to them.

The facts and circumstances as respects the defendants are not in all particulars identical, and especially is this true regarding Walter Stanland and his two coplaintiffs in error. The vital question to be determined as to each of these three defendants is, whether the evidence is sufficient to support the verdict against them. We cannot for a moment believe that any doubt exists as to the conspiracy and the connection of the several plaintiffs in error with the same, and in what may therefore be said as to the three plaintiffs in error, we will consider the status of Stanland separately from that of the other two, Snow and Perry.

Taking the case of the latter two, and viewing the same in the light of the government's contentions, and the entire testimony, there would seem to be little doubt as to their guilt, but when their conduct is also regarded in the light of the particular circumstances as applicable to them, viz. that while, as claimed by them, they were wholly disconnected at first with the other participants in the conspiracy, they nevertheless so acted as to become a party to said conspiracy, and to be guilty thereof. They claimed to have been sent from Charleston, S. C., to the location of the schooner, the Edgar Hurst, in the Little river, near the vicinity known as Calabash, in the state of North Carolina, for the purpose of making repairs to the vessel, and with a view of selling an automobile used by them. In the midst of a raid by government officers upon the depository of contraband liquor, the defendants Snow and Perry left the Edgar Hurst, as claimed by them, and came over to the scene of the raid for the alleged purpose of claiming two automobiles left by them, as they said, when they went to do the repair work to the vessel. The two cars in question, one a Hupmobile, and the other a Ford truck, thus claimed by them, were found in close proximity to the stored liquor, and had no license tags upon them, and the defendants asserted their claims to the cars under fictitious names. They were immediately placed under arrest, and it was found that Perry had on his person a large sum of money, his explanation being that he had sold one of the automobiles, the Hupmobile, for $1,000, to one of the parties present, but not called as a witness by the defense.

The two cars thus claimed by the defendants each contained, as well as those arriving at the pit where the liquor was concealed the night of the arrest, a five-gallon can of excess gasoline, signifying that the car operators were all actuated by the same motive, and that the excess gasoline was needed because of the desire to have the same without stopping at supply stations, and thus to complete long trips at night. It further appeared that these defendants, with their two cars, left Charleston Sunday night, after the usual Sunday afternoon traffic, indicating a participation in the conspiracy and proposed violation of the law, rather than the purpose to repair a boat 150 miles away, and to make a sale of an automobile.

These specific circumstances, and others mentioned, considered in the light of the entire testimony, would seem to make clear the participation of the plaintiffs in error Snow and Perry in the offense charged, and certainly it cannot be said that the jury was not warranted in its findings, if it believed the government's case, and was disinclined to accept the explanations made by the plaintiffs in error to exculpate and exonerate themselves in the doubtful position in which they were placed. The jury was, therefore, warranted in returning a verdict of guilty against them. Indeed, no other rational conclusion, having regard to the entire testimony, could have been reached.

What is said of the plaintiffs in error Snow and Perry is largely true also of the plaintiff in error Walter Stanland, as well with regard to the evidence of the conspiracy as to his participation therein, arising from his apparent connection with the same. The location of the pit in which the contraband liquor was stored, and the removal and transportation therefrom, in the immediate vicinity of Stanland's home, which was only some quarter of a mile away, with no other residence near by, and upon land under his control, the roads thereto passing close by his residence, and with two gates crossing them and the premises posted to "Keep Out," so near to Stanland's residence that he could hear the movements of the vehicles to and from the place, must necessarily have informed him, at least, of what was going on, in large measure, at the scene of the storage of the contraband liquor, and the place from which the same was being removed.

Assuming that the jury believed the government's evidence, there can be no doubt of the actual participation of Stanland in the commission of the offense charged, and upon his admitted knowledge of the circumstances of the case it is hard to reconcile his conduct with innocence. The selection of the place for storage, and the facilitating of the transportation of the liquor, away from the scene of business activities generally, and to a remote vicinity near the secluded home of a public officer, whose duty it was to prevent infractions of the law of this kind, in view of the claim of the participation of the accused in the crime, and his admitted knowledge of the surrounding conditions, raises a strong presumption against him as to his guilty knowledge of what was being done. It is difficult to understand why this location should have been chosen, save for the protection of the violators of the law, and certainly there is nothing to indicate that the parties to any of the transactions were attempting to enforce the law against those engaged in the violation of the same.

Considering the assignments of error to the court's action as aforesaid, either separately or as a whole, it will be found that the same are without merit. The rulings upon the testimony, whether in the admission or rejection of the same, relate to matters either within the court's discretion or in which the outcome of its conclusion resulted in nothing prejudicial to the plaintiffs in error. The court's charge was free from error, entirely fair to the plaintiffs in error,

and carefully safeguarded their rights at every step in fully and unreservedly submitting the case upon the facts for the determination of the jury, and the assignments of error based upon the motions to take the case from the jury, and the refusal to set aside its verdict and in rendering a judgment upon the same against plaintiffs in error, are without merit. A contrary course would have been arbitrary, and clearly an unwise exercise of the judicial discretion reposed in the trial judge in passing upon the several motions.

The court's action complained of was clearly right, and its judgment should be affirmed.